UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

PAULINE C. RICHARDSON

versus

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

CIVIL ACTION NO. 04-2565

JUDGE HICKS

**REFERRED TO:
MAGISTRATE JUDGE HORNSBY**

## MEMORANDUM RULING

**Introduction**

Pauline Richardson ("Plaintiff") applied for disability benefits based primarily on complaints of back pain. Plaintiff has a high school equivalency education, and she was 51 years old when ALJ Bundy decided her claim in September 2004. The ALJ denied the claim, based on his finding that Plaintiff had the ability to perform the demands of her past job as a cashier.

The Appeals Council denied a request for review, and Plaintiff filed this civil action to seek the limited judicial review permitted by 42 U.S.C. § 405(g). The parties filed written consent to have the case decided by a magistrate judge and, pursuant to 28 U.S.C. § 636(c) and the standing order of the district court regarding social security cases, the case was referred to the undersigned for decision. For the reasons that follow, the Commissioner's decision will be affirmed.

**Issues on Appeal**

Plaintiff identifies three issues on appeal: (1) the decision that Plaintiff can do her past work is not supported by substantial evidence; (2) the ALJ erred in rejecting the opinion of treating physician Dr. Tymwa Dixon; and (3) the ALJ erred when he found that Plaintiff does not meet or equal a listing.

**Standard of Review; Substantial Evidence**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990). "Substantial evidence is more than a scintilla and less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is justified only if there are no credible evidentiary choices or medical findings which support the ALJ's determination. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

**Medical Evidence**

Plaintiff began seeing Dr. Tymwa Dixon, a family practitioner, in 1998 for a variety of health problems. Plaintiff reported back pain during a visit in 2001, and Dr. Dixon prescribed Celebrex and Vioxx. Tr. 181. Plaintiff reported back pain at later visits and reported muscle spasms in July 2002. Plaintiff had spent four hours at the gym the week before, which may have contributed to the problems. Tr. 177. Plaintiff again complained

of back pain in August 2002, and Dr. Dixon gave her hydrocodone and scheduled an MRI. Tr. 176. The MRI showed that the lumbar vertebral bodies were normally aligned, and the intervertebral discs were normal at L1-2 and L2-3. At the L3-4 and L4-5 levels, there was "disc desiccation but no evidence of disc herniation." At the L5-S1 level, there was "disc degeneration with disc desiccation and decrease in disc height and a small central disc protrusion." Dr. Dixon scheduled physical therapy after reviewing the report. Tr. 174. Dr. Dixon's notes indicate an intent to refer Plaintiff to orthopedics or a neurosurgeon for evaluation. Tr. 173.

Plaintiff was evaluated by Dr. Pierce Nunley, an orthopedic specialist, in October 2002. Plaintiff reported a history of bad pains in her lower back and muscle spasms in both legs that lasted 20-25 minutes. She reported shooting numbness from her mid low back into her legs and feet, which she believed was especially bad because her cashier job required her to stand for long periods of time. Plaintiff reported some physical therapy at Willis-Knighton, but she said it had not helped. She was taking Flexeril, Lortab, Vioxx and other medication. An X-ray showed "some degenerative changes of the lower lumbar spine" with spondylosis at L4-5 and L5-S1. Dr. Nunley read the MRI to show no significant neural impingement at L3-4, mild to moderate stenosis at L4-5, and some mild stenosis at L5-S1. Plaintiff's range of motion was found to be somewhat limited in forward flexion due to complaints of pain. Dr. Nunley reported that there was "an obvious component of PGD," which is pelvic girdle dysfunction and relates to Plaintiff's obesity. (Plaintiff was reported

in 2004 to be 4'11" and weighing 265 pounds.) Dr. Nunley suggested an L5 selective nerve root block, a change of physical therapy from Willis-Knighton to Tri-State and an EMG. Tr. 163-64.

Dr. David Adams performed the electrodiagnostic examination on Plaintiff's legs and related lumbar muscles. His findings were suggestive of an S1 radiculopathy, but the indication was very subtle and called for close correlation with other diagnostic studies. Tr. 139-40. Dr. Ross Nelson administered a nerve root block at L5 in November 2002. Tr. 142-43.

Plaintiff began physical therapy with Tri-State in November 2002. She reported to Dr. Nunley in January 2003 that her leg symptoms were better but her back was about the same. She thought she was getting to the stage where she could "live with this," and Dr. Nunley recommended continuation of therapy. Tr. 160. Therapy notes indicate that Plaintiff continued to have muscle spasms, her PGD was stable, and she seemed to be dizzy from her various medications. Tr. 159. The therapist at least once questioned Plaintiff's compliance with her exercise program. Tr. 158. The therapy ended, due to insurance company restrictions, in February 2003. Dr. Nunley told Plaintiff to consider whether she wanted surgery. If she did, he suggested a CT/myelogram to make plans on areas to decompress. Tr. 157. Plaintiff applied for benefits the next month.

Dr. Dixon continued to see Plaintiff. Plaintiff reported in March 2003 that she was starting to have pain in her upper back as well, and in April, Dr. Dixon referred Plaintiff to

a pain management program. He continued prescribing medication for her, including methadone. Tr. 166-67.

Dr. A. R. Ebrahim, an internist, performed a consultative examination in May 2003. Plaintiff's weight was reported at 287 pounds. The report contains little detail regarding the examination, but Dr. Ebrahim reported that the "musculoskeletal exam was normal" and that Plaintiff's gait and station were normal. Tr. 202-06.

Dr. William Whyte, II performed a lumbar discogram in June 2003. (The procedure involves the injection of dye into the discs of the spine so that X-rays or other views might provide more information.) Dr. Whyte reported that a CT scan indicated the L3-L4 disc contained a fissure that extended to the outer 1/3rd of the annulus (the strong outer ring of fibers around the discs). The L4-L5 disc demonstrated contrast from the nucleus through the wall of the annulus. Dr Whyte noted that there was no pain response during the course of the procedure. His impression was "positive lumbar discogram for internal disc disruption syndrome at L3-L4." Tr. 227.

Dr. Dixon completed a form designed to assess Plaintiff's residual functional capacity ("RFC"). At the time of the August 2003 assessment, Plaintiff was taking Kadian (a morphine product prescribed by pain management) and Flexeril (a muscle relaxant). Dr. Dixon opined that Plaintiff could sit for no more than 30 minutes at a time without needing to stand or lie down, and that she could stand/walk for only 10 minutes at a time for a total of one hour in a work day. He indicated that Plaintiff could occasionally lift or carry 10

pounds, but no more. He believed she could occasionally reach overhead, but could never bend, squat, stoop or kneel. He indicated that Plaintiff would require very frequent unscheduled interruptions of work to alleviate pain and that she would have to miss work very frequently. He opined that Plaintiff's pain would increase with time. He concluded: "Patient has severe pain even at rest and it is very unlikely she will ever have the capacity to return to active employment due to nature of her back problem." Tr. 239-42.

Dr. Dixon wrote in a report to Union National Life Insurance that Plaintiff was totally disabled because she had a "well documented degenerative disc disease which will not improve." He added that Plaintiff's symptoms "are treated with medications which are only partially effective." He added: "Patient is incapable of even prolonged sedentary activity such as sitting due to back pain." Tr. 246-47. He also directed a letter to the state agency, in which he noted Plaintiff's complaints of severe pain in the back with radiation of pain and numbness into her legs, exacerbated by activity. Dr. Dixon stated that the MRI and discogram findings were consistent with the symptoms and that even the potent Kadian had not relieved the symptoms. Tr. 255.

After the hearing, the ALJ asked orthopedic specialist Dr. Robert Holladay IV to perform a consultative examination. Dr. Holladay reported his examination of the lumbar spine as: "Flexion to 25º. Extension to 10º. Lateral bending to 10º bilaterally. No muscle spasms. There is generalized tenderness across the lumbar spine." A straight leg raise test was negative for both legs sitting and lying to 75º. Dr. Holladay's view of X-rays indicated

moderate narrowing at the L5-S1 disc space and a questionable grade 1 spondylolisthesis at L4-L5. He noted moderate degenerative changes of the facet joints and moderate osteoarthritic changes of the sacroiliac joints with some mild spur formation. He opined that Plaintiff was physically capable of sitting, standing or walking for at least 6 out of 8 hours in a work day and that she could use her arms to reach overhead. He believed that she was capable of frequently lifting up to 10 pounds and occasionally up to 20-25 pounds. Tr. 270-73.

**Summary of the ALJ's Decision**

The ALJ analyzed the claim pursuant to the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 (governing claims for disability insurance benefits) and § 416.920 (parallel regulations governing claims for Supplemental Security Income) and described in Barnhart v. Thomas, 124 S.Ct. 376, 379-80 (2003). He found that Plaintiff had not engaged in substantial gainful activity (step one) since her claimed onset date of October 17, 2002. He next found that Plaintiff had degenerative disc disease, depression and obesity, impairments that are severe (step two) within the meaning of the regulations, but not severe enough to meet or medically equal a listed impairment (step three).

He then reviewed the medical evidence, assessed Plaintiff's credibility and concluded Plaintiff had the RFC to perform a full range of light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though a job may require lifting of only very little weight, it will still be

classified as light rather than sedentary if it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. A person must have the ability to do substantially all of these activities to be found capable of performing the full range of light work. 20 C.F.R. §§ 404.1567(b) and 416.967(b).

The ALJ then turned to whether Plaintiff could perform the demands of her past relevant work (step four). Plaintiff described her cashier job as requiring walking and standing 6 hours a day and lifting less than 10 pounds. The ALJ found that she was capable of performing that type of work, so he concluded that Plaintiff was not disabled.

**Listing**

Plaintiff submits that she "arguably" meets or equals listing 1.04 (disorders of the spine). The ALJ considered listing 1.04 but found that Plaintiff did not meet or equal it because she did not have evidence of nerve root compression, spinal arachnoiditis or pseudoclaudication. Tr. 16. The listing includes a detailed set of symptoms that must accompany herniated disc, spinal stenosis or another problem that results in the compromise of a nerve root. The listing is plainly intended to include only the most serious cases of spinal disorders, as a finding that it is satisfied means the claimant is disabled no matter her age, education or level of job skills. Plaintiff points to the most favorable evidence that could be construed to support some of the necessary findings, although she concedes there is no evidence of motor loss by atrophy. The listing requires that, if there is involvement of the

lower back, there be positive straight-leg raising tests (sitting and supine).

Plaintiff does not identify such tests, and Dr. Holladay reported *negative* SLR tests. Plaintiff suggests that Dr. Holladay's report, once properly understood, actually suggests a positive SLR. Plaintiff argues that Dr. Holladay's statement that the SLR test was negative sitting and lying to 75º should be interpreted as a positive result because normal is in the 80-85º range. However, the court is not equipped to second guess a physician's interpretation of a physical examination that he conducted, absent a truly plain error that is obvious to a lay person. This is not such a case. The 75º level discussed by Dr. Holladay is not so far from the 80-85º that Plaintiff suggests is the standard that the court can say any error was committed (even assuming 80-85º is correct). Furthermore, there is no statement that Plaintiff exhibited pain at any degree of the SLR test. Perhaps Dr. Holladay only tested to the 75º point. In any event, Plaintiff has the burden at step three of showing how she meets or equals a listing, and she has not presented an adequately compelling argument to set aside the ALJ's conclusion on this issue.

**Dr. Dixon's Opinions**

Plaintiff argues that the ALJ should not have rejected Dr. Dixon's opinions in favor of those offered by Dr. Holladay. Ordinarily, "the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985). The treating physician's opinions, however, are far from

conclusive. "[T]he ALJ has the sole responsibility for determining the claimant's disability status." Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir.1990). Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the treating physician's testimony. The good cause exceptions that have been recognized include statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. Scott, 770 F.2d at 485. In sum, the ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." Id. See Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994).

The ALJ noted that Dr. Holladay is an orthopedist, while Dr. Dixon was a family practice physician. He also reviewed Dr. Dixon's examination notes and found that they did not contain the rather serious findings indicated in Dr. Dixon's letter to the agency. Plaintiff responds that Dr. Dixon's medical reports do contain indications of problems such as muscle spasms, numbness or dizziness. There are some references to Plaintiff complaining of such problems, but there are no indications that Dr. Dixon made objective clinical findings, based on testing or recognized diagnostic means, that those symptoms existed. The reference to muscle spasms noted by Plaintiff was, for example, contained in a letter to a fitness club that Dr. Dixon wrote in an effort to get Plaintiff out of her contract. The ALJ also observed that no other treating or examining physician concluded that Plaintiff was totally disabled or had such severe limitations as suggested by Dr. Dixon.

Plaintiff also faults the ALJ for failing to mention every aspect of Dr. Holladay's report, such as his notation that Plaintiff had only "fair balance" and that her knees had generalized grinding. Plaintiff also argues that Dr. Holladay's statement that the straight leg raise test was negative sitting and lying to 75% should be interpreted as a positive result, as discussed above. The ALJ is entitled to weigh the credibility and persuasiveness of opinions offered by physicians. The opinions from Dr. Dixon have the benefit of coming from a treating physician, but there is little indication that his opinions stem from diagnostic means other than Plaintiff's subjective reports. Dr. Holladay's report contains a detailed discussion of the examination he conducted and the precise results, such as the 75° on the straight leg raise test. Dr. Dixon's records, on the other hand, contain only a note of a "+SLR" with no elaboration. A reasonable person could choose to favor the opinion of Dr. Dixon, but the ALJ had good cause to, instead, favor the opinion of orthopedic specialist Dr. Holladay.

Plaintiff cites Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000), which requires an ALJ to consider a list of six factors before rejecting a treating physician's opinion in favor of an opinion from a *non*-examining source. Later cases have made clear that the six-factor review is not required when there is competing first-hand medical evidence. Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003); Nall v. Barnhart, 78 Fed. Appx. 996 (5th Cir. 2003). There is competing first-hand medical evidence in this case, so Newton was not violated.

**Conclusion**

One of Plaintiff's assigned errors is that the ALJ was wrong to conclude she could do

her past work. There is no specific argument with respect to the demands of the past work, as found by the ALJ. The assigned error appears to be a general attack on the RFC found by the ALJ, which was fully discussed above. The RFC, based largely on Dr. Holladay's report, is supported by substantial evidence. A judgment affirming the Commissioner's decision will be entered.

      THUS DONE AND SIGNED at Shreveport, Louisiana, this 7th day of March, 2006.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE